IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


| | | |
|---|---|---|
| JUAN GUITIERREZ,<br>Derivatively on Behalf of<br>CORNELL COMPANIES, INC.,<br><br>          Plaintiff,<br><br>v.<br><br>STEVEN W. LOGAN, ANTHONY R.<br>CHASE, JAMES H.S. COOPER,<br>DAVID M. CORNELL, PETER A.<br>LEIDEL, HARRY J. PHILLIPS, JR.,<br>TUCKER TAYLOR, MARCUS A. WATTS,<br>ARLENE R. LISSNER, and JOHN L.<br>HENDRIX,<br><br>          Defendants,<br><br>and<br><br>CORNELL COMPANIES, INC.,<br>a Delaware Corporation,<br><br>          Nominal Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-02-1812 |


**<u>MEMORANDUM OPINION AND ORDER</u>**


     Plaintiff, Juan Guitierrez, derivatively on behalf of Cornell

Companies, Inc. (Cornell), brings this action against defendants,

Steven W. Logan, Anthony R. Chase, James H.S. Cooper, David M.

Cornell, Peter A. Leidel, Harry J. Phillips, Jr., Tucker Taylor,

Marcus A. Watts, Arlene R. Lissner, and John L. Hendrix, and

nominal defendant Cornell, for breach of fiduciary duty and waste

of corporate assets.  Pending before the court is Defendants'

Motion to Dismiss (Docket Entry No. 31) for failure either to make a pre-suit demand or to allege particularized facts demonstrating that such a demand would have been futile if made.  For the reasons set forth below, defendants' motion to dismiss will be granted.

## I.  **Background**

This action arises from Cornell's restatement of its financial results for the year ended December 31, 2000, and for the first three quarters of 2001 based on the accounting treatment accorded to two transactions:  (1) a synthetic lease executed in 2000; and (2) a sale/leaseback agreement announced in August of 2001.[1] Although plaintiff fails to allege any facts about the synthetic lease, long passages of his amended complaint are devoted to factual allegations about the sale/leaseback agreement.

## A.   **Factual Allegations**

Plaintiff alleges that the sale/leaseback agreement announced on August 15, 2001, was a transaction in which Cornell sold eleven of its facilities to Municipal Corrections Finance LP (MCF) for $173 million, and then agreed to lease those eleven facilities from MCF for an initial period of 20 years with renewal options for approximately 25 more years.[2]  Plaintiff alleges that Cornell

---

[1]Verified Amended Derivative Complaint (Amended Complaint), Docket Entry No. 12, p. 1 ¶ 1.

[2]Id. at p. 14 ¶ 31, and p. 17 ¶ 33.

described MCF as an independent special purpose entity (SPE) with
no prior relation to Cornell that was capitalized with third-party
equity.[3]  Plaintiff alleges that on the day that Cornell announced
the sale/leaseback agreement it also announced that its financial
results for the period ended June 30, 2001, exceeded analysts'
estimates.[4]

Plaintiff alleges that on October 30, 2001, Cornell announced
that its financial results for the period ended September 30, 2001,
exceeded analysts' estimates.[5]  Plaintiff alleges that on the same
day, i.e. October 30, 2001, Cornell announced that it intended

> to make a public offering of 3,000,000 newly issued
> shares of its common stock, plus up to 450,000 additional
> shares to cover any over-allotments. All shares of the
> common stock are being offered by the Company.  The
> shares of common stock are being offered through a
> prospectus supplement pursuant to the Company's effective
> shelf registration statement in an offering lead by
> Lehman Brothers, and co-managed by Jefferies & Company
> and First Analysis Securities.[6]

Plaintiff alleges that on or about December 3, 2001, Cornell sold
at least 3,000,000 shares of company stock in the open market for
$14.00 per share, for gross proceeds of over $48 million.[7]
Plaintiff alleges that Cornell sold these shares of stock "pursuant

---

[3] Id. at p. 15 ¶ 32.

[4] Id. at p. 15 ¶ 33.

[5] Id. at p. 17 ¶ 35.

[6] Id. at p. 19 ¶ 37.

[7] Id. at p. 19 ¶ 38.

to a false and misleading Registration Statement, prepared by and/or authorized and/or adopted by defendants."[8]   Plaintiff alleges that the registration statement for the stock sale was false and misleading because it described MCF as a "third-party special-purpose entity with no prior relationship to [Cornell]."[9]

Plaintiff alleges that on February 6, 2002, Cornell announced that it was reviewing the sale/leaseback transaction:

> Cornell Companies Inc. announced today a Special Committee of its Board has been formed to review the accounting for its August 2001 sale/leaseback transaction.   The review is focused on a retainer agreement entered into with an investment bank ("Investment Bank") in September 2001, which provided (i) that Cornell pay the investment bank a non-refundable retainer fee of $3.65 million to provide financial advisory services concerning future financing vehicles and the strategic development of Cornell's business and (ii) that the retainer would be applied on a mutually agreed upon basis toward future contingent fees associated with investment banking services that may be provided to Cornell.   The inquiry focuses on whether the retainer agreement affects the previously reported accounting treatment for the August 2001 sale/leaseback transaction, and whether the amount paid the Investment Bank was appropriately reflected in the Company's financial statements.
>
> The sale/leaseback transaction involved a special purpose entity, Municipal Corrections Finance, L.P. ("MCF"), unaffiliated with Cornell and headquartered in Baton Rouge, La.   The Investment Bank affiliates are the sole equity owners of the special purpose entity.   The Special Committee is reviewing whether, as an accounting matter, the retainer amount paid by Cornell to the Investment Bank would reduce the previously established equity of the Investment Bank affiliate in the special purpose entity.

---

[8]<u>Id.</u>

[9]<u>Id.</u>

-4-

If the equity were reduced below required levels, the effect would have material financial consequences, including requiring the consolidation of MCF's assets, liabilities and results of operations in Cornell's financial statements beginning in the 3rd quarter of 2001.   In that event, Cornell's balance sheet would include the book value of the leased properties as an asset and the outstanding debt of MCF as a liability. Further, although consolidation would not have an effect on the Company's actual net cash flow, results of operations would be negatively impacted to the extent that interest on the MCF debt and depreciation on the facilities exceeded rental expense recorded by Cornell with respect to the leased facilities.[10]

Plaintiff alleges that on March 6, 2002, Cornell announced that it would restate its earnings for fiscal year 2000 and the first three quarters of 2001.[11]  Plaintiff alleges that on March 7, 2002, The Wall Street Journal reported that

Cornell Cos. said it will restate its results for 2000 and most of 2001 to undo two transactions, a move that will reduce earnings by six cents a share, or about $744,000, for the first three quarters of 2001.

The restatement will require the company, one of the nation's largest private prison concerns, to ask its banks to waive certain terms of its senior credit facility.  Cornell said, based on talks with lenders, it expects either to obtain a waiver or to restructure its loan agreement.

In addition to the restatement, the company said undoing the transactions will add $247 million to its assets and its debt as of Sept. 30, so that a lease and a sale/leaseback are no longer off-balance sheet transactions.

Cornell said in February that a committee of its outside directors was reviewing the accounting treatment for an August 2001 transaction in which it sold 11 of its

---

[10]Id. at pp. 21-22 ¶ 42.

[11]Id. at p. 22 ¶ 45.

facilities and leased them back to reduce its heavy debt
load.  Under the sale-leaseback arrangement, Cornell sold
the facilities to Municipal Corrections Finance LP, a so-
called special purpose entity, in a $173 million deal
lead by Lehman Brothers.

The following month, Cornell agreed to pay Lehman $3.65
million in fees.  The company's auditor, Arthur Andersen
LLP questioned whether Cornell's payment funded Lehman's
stake in the special purpose entity, reducing Lehman's
actual investment below the 3% needed to make the entity
independent.[12]

**B.   Legal Allegations**

Plaintiff filed this action on May 15, 2002, and on August 28,

2002, plaintiff filed a Verified Amended Derivative Complaint

(Docket Entry No. 12) in which he asserted claims against Cornell's

officers and directors for breach of fiduciary duties of loyalty

and due care and waste of corporate assets.[13]  "Each defendant is

sued individually in his respective capacity as an officer and/or

director of Cornell.  The liability of each arises from the fact

that each participated in the plan to advance his own personal

interests at the expense of Cornell and its shareholders."[14]

**II.   Defendants' Motion to Dismiss**

Defendants move to dismiss this action because plaintiff

failed to make a pre-suit demand on Cornell's board of directors,

---

[12]_Id._ at p. 24 ¶ 47.

[13]_Id._ at pp. 35-36 ¶¶ 64-68.

[14]_Id._ at p. 11 ¶ 26.

and failed to allege particularized facts demonstrating that such demand would have been futile if made.[15]  The amended verified complaint expressly states that "[p]laintiff has not made any demand on the present Board of Cornell to institute this action because such a demand would be a futile, wasteful and useless act."[16]

**A.    Law Governing Pre-Suit Demand**

    1.    <u>Federal Rule of Civil Procedure 23.1</u>

Federal Rule of Civil Procedure 23.1 requires plaintiffs in shareholder derivative suits to file verified complaints alleging

> (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.  The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

"[A]lthough Rule 23.1 clearly <u>contemplates</u> both the demand requirement and the possibility that demand may be excused, it does not <u>create</u> a demand requirement of any particular dimension." <u>Kamen v. Kemper Financial Services, Inc.</u>, 111 S.Ct. 1711, 1716

---

[15]Defendants' Motion to Dismiss, Docket Entry No. 31, p. 3.

[16]Amended Complaint, at p. 27 ¶ 55.

(1991) (emphasis in original).  "The purpose of requiring a pre-complaint demand is to protect the directors' prerogative to take over the litigation or to oppose it."  Id. at 1719.  "In most jurisdictions, the board's decision to do the former ends the shareholder's control of the suit, . . . while its decision to do the latter is subject only to the deferential 'business judgment rule' standard of review."  Id.  "Although 'jurisdictions differ widely in defining the circumstances under which demand on directors will be excused,' . . . demand typically is deemed to be futile when a majority of the directors have participated in or approved the alleged wrongdoing, . . . or are otherwise financially interested in the challenged transactions."  Id. Recognizing that Rule 23.1 gives little dimension to the demand requirement, the Court directed lower federal courts to look to state law to determine the scope of the demand requirement.  Id. at 1722-1723. Since Cornell is incorporated in Delaware, the parties agree that the substantive law of Delaware applies.[17]  Id. at 1723.

     2.   <u>Delaware Chancery Court Rule 23.1</u>

     Delaware's demand requirement, which is nearly identical to R. 23.1, is set forth in Court of Chancery Rule 23.1, which states:

     In a derivative action brought by 1 or more shareholders
     or members to enforce a right of a corporation . . . the

---

     [17]Both parties rely on Delaware demand futility law.  See Defendants' Motion to Dismiss, Docket Entry No. 31, at pp. 4-5; Plaintiff's Opposition, pp. 6-9.

> corporation or association having failed to enforce a
> right which may properly be asserted by it, the complaint
> shall allege that the plaintiff was a shareholder or
> member at the time of the transaction of which the
> plaintiff complains or that the plaintiff's share or
> membership thereafter devolved on the plaintiff by
> operation of law. The complaint shall also allege with
> particularity the efforts, if any, made by the plaintiff
> to obtain the action the plaintiff desires from the
> directors or comparable authority and the reasons for the
> plaintiff's failure to obtain the action or for not
> making the effort.

Del. Ch. Ct. R. 23.1. Since derivative actions impinge on the managerial freedom of directors, "the demand requirement of Chancery Rule 23.1 exists at the threshold, first to ensure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." Seaford Funding Ltd. Partnership v. M&M Associates II, L.P., 672 A.2d 66, 71 (Del. Ch. 1995) (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), overruled on other grounds sub nom. Brehm v. Eisner, 746 A.2d 244, 253-254 & n.13 (Del. 2000) (overruling abuse of discretion standard of review on Rule 23.1 motion to dismiss derivative suit)). Plaintiff contends that the demand requirement should be excused because demand on Cornell's board would be futile.[18]

## B.    Standard of Review

"In considering a motion to dismiss under Chancery Court Rule 23.1 for failure to make a pre-suit demand, as is true in the case of a motion to dismiss under Court of Chancery Rule 12(b)(6),

_____

[18]See Amended Complaint, p. 27 ¶ 55.

the Court confines its attention to the face of the complaint." White v. Panic, 793 A.2d 356, 363 (Del. Ch. 2000), aff'd, 783 A.2d 543 (Del. 2001).   Moreover, "all facts of the pleadings and reasonable inferences therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true."  Id. (quoting Grobow v. Perot, 539 A.2d 180, 187, n.6 (Del. 1988), overruled on other grounds by Brehm, 746 A.2d at 244).  The court "need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." Grobow, 539 A.2d at 187.

## C.   Demand Futility

### 1.   Legal Standards for Pleading Demand Futility

Under Delaware law derivative plaintiffs must satisfy one of two tests to establish that demand is excused as futile.   When a plaintiff's claims arise from an affirmative business decision made by a corporation's board of directors, courts apply the two-prong test laid out in Aronson, 473 A.2d at 814.   Under Aronson courts will excuse pre-suit demand if the complaint alleges, with particularity, sufficient facts to create a reasonable doubt that (1) a majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the

directors' valid exercise of business judgment.  <u>Aronson</u>, 473 A.2d
at 814.  "[W]here directors are sued derivatively because they have
failed to do something (such as a failure to oversee subordinates),
demand should not be excused automatically in the absence of
allegations demonstrating why the board is incapable of considering
a demand."  <u>Rales v. Blasband</u>, 634 A.2d 927, 934 n.9 (Del. 1993).
The difference between the <u>Aronson</u> test and the <u>Rales</u> test is that
courts do not make the second <u>Aronson</u> test inquiry under the <u>Rales</u>
test.  <u>See</u> <u>Guttman v. Huang</u>, 823 A.2d 492, 499-501 (Del. Ch. 2003)
(citing <u>Aronson</u>, 473 A.2d at 814) (comparing <u>Aronson</u> and <u>Rales</u> and
concluding that the policy justification for each test points the
court toward a similar analysis).

  2.  <u>Standard Applicable to Plaintiff's Allegations</u>

  Plaintiff asserts in his opposition to defendants' motion to
dismiss that

> [i]n 2000, Cornell's Board authorized a synthetic lease
> transaction with a SPE and in August 2001, Cornell's
> Board authorized the recording of a sale and lease-back
> of certain real estate in off-balance sheet transactions
> again to an SPE. . . .  Defendants caused the Company to
> tell investors that the sale/leaseback and synthetic
> lease were proper off-balance sheet transactions
> conducted with legitimate and independent third-party
> SPEs. . . .  Defendants concealed the fact that both
> transactions must, and should always have been,
> consolidated for financial accounting purposes in the
> Company's restated reports and for future periods. . . .
> These illicit transactions violated Generally Accepted
> Accounting Principles ("GAAP") related to SPEs.[19]

---

[19]Plaintiff's Opposition, p. 4.

Contrary to these assertions, plaintiff's amended complaint does
not allege that Cornell's board authorized or approved either of
the two contested transactions, i.e., the synthetic lease entered
in 2000 or the sale/leaseback agreement entered in August of 2001.
Plaintiff alleges only that the director defendants individually
breached their fiduciary duties of loyalty and due care to Cornell
and wasted corporate assets by (1) "continuously failing to
disclose that the complex sale and lease-back transactions and
synthetic leases . . . were improper under GAAP and would
ultimately require consolidation onto the Company's balance sheet
at a later time,"[20] (2) "causing Cornell to sell over $48 million
of newly issued stock in the open market, during the period that
[Cornell] had improperly and illegally entered into sale and lease-
back transactions with a non-independent SPE;"[21] and (3) "forcing
the Company to artificially inflate operating results and create
the false and misleading impression that Cornell was performing
according to guidance . . . when defendants knew that they had
improperly entered into illegal off-balance sheet transactions with
a non-independent SPE."[22]  Plaintiff explains that

> [b]ecause the Individual Defendants have breached their
> duties of loyalty, good faith and independence in

---

[20]Amended Complaint, p. 35 ¶ 65(a), and p. 36 ¶ 67(a).

[21]Id. at p. 35 ¶ 65(b), and p. 36 ¶ 67(b).

[22]Id. at p. 35 ¶ 65(c), and p. 36 ¶ 67(c).

-12-

connection with their <u>failure to act properly relating to
the business of the Company</u>, the Individual Defendants,
as a matter of law, have breached their fiduciary duties
of good faith and fair dealing owed to Cornell and its
shareholders.[23]

The <u>Rales</u> court found that the "essential predicate" for
applying the <u>Aronson</u> test was that "a <u>decision</u> of the board of
directors is being challenged in the derivative suit."  634 A.2d at
933 (emphasis in original).  The court in <u>Rales</u> stated that "where
the board that would be considering the demand did not make a
business decision which is being challenged in the derivative
suit," there are three scenarios in which the <u>Aronson</u> test would
not apply:

> (1)  where a business decision was made by the board of
> a company, but a majority of the directors making the
> decision have been replaced; (2) <u>where the subject of the
> derivative suit is not a business decision of the board</u>;
> and (3) where [ ] the decision being challenged was made
> by the board of a different corporation.

<u>Id.</u> at 933-934 (emphasis added).

Although the subject of this suit is not a business decision
of Cornell's board but, instead, the board's failure to act, citing
<u>In re Abbott Laboratories Derivative Shareholders Litig.</u>, 325 F.3d
795 (7th Cir. 2003), plaintiff argues that the <u>Aronson</u> test applies
to his demand futility allegation because "where 'directors [are]
aware of known violations,' because, for instance, they are
'members of the Audit Committee,' and 'chose' not to address the

---

[23]<u>Id.</u> at pp. 11-12 ¶ 28 (emphasis added).

violations, defendants cannot claim 'unconsidered' inaction."[24]  The
complaint in Abbott alleged that the board "knew of the violations
of law" by company managers on the basis of "an extensive paper
trial" that spanned a six-year period, id. at 809, including
several warning letters from the Food and Drug Administration
(FDA), id. at 800, 802, and an article in The Wall Street Journal,
"about Abbott's FDA problems," id. at 808.  Since the plaintiffs
had alleged that the defendant directors knew about the continuing
violations, the Abbott court analyzed plaintiff's assertion of
demand futility under Aronson instead of Rales because it concluded
that the board had affirmatively decided that no action was
required.  Id. at 806.

Plaintiff in this action makes no particularized allegations
showing either that the challenged transactions were board level
decisions or that any specific board members approved or
participated in them.  Instead of alleging that either the
synthetic lease or the sale/leaseback transaction resulted from a
conscious decision of the board, plaintiff alleges that Cornell's
board ratified the transactions by failing to take action against
the nameless officers and directors who engineered, executed, and
reported them.[25]  Since plaintiff's allegations do not attack a

_____

[24]Plaintiff's Opposition, p. 10.

[25]Amended Complaint, p. 11 ¶ 25.

-14-

specific business judgment of Cornell's board but, instead, allege
that the board "failed to act properly relating to the business of
the Company," the court concludes that the <u>Rales</u> test, and not the
<u>Aronson</u> test, should be applied to determine whether demand is
excused.  <u>Rales</u>, 634 A.2d at 933-934.  <u>Rales</u> requires the court to

> determine whether or not the particularized factual
> allegations of a derivative stockholder complaint create
> a reasonable doubt that, as of the time the complaint is
> filed, the board of directors could have properly
> exercised its independent and disinterested business
> judgment in responding to a demand.  If the derivative
> plaintiff satisfies this burden, then demand will be
> excused as futile.

<u>Id.</u>

## D.   Plaintiff's Demand Futility Allegations

Plaintiff contends that the allegations in his amended
complaint demonstrate that pre-suit demand was futile because "not
just a majority (five), but all <u>nine</u> Cornell directors were unable
to evaluate demand in a disinterested and independent fashion."[26]
Plaintiff contends that

> [f]ive directors as Audit Committee members breached
> their fiduciary duties by recommending the issuance of
> nearly two years of false and misleading financial
> statements concerning off-balance sheet transactions
> which needed to be restated.  Three other directors are
> financially beholden to Cornell.  Several others have
> over-lapping debilitating business relations.  Two
> directors personally benefitted from selling while in
> possession of inside information.  In addition, the
> entire Board approved the false and misleading

---

[26]Plaintiff's Opposition, p. 9.

Registration Statement in order to perpetrate the illicit Secondary Offering.[27]

"To establish that a <u>board</u> was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the <u>individual members</u> of that board." <u>Orman v. Cullman</u>, 794 A.2d 5, 22 (Del. Ch. 2002) (emphasis in original). A plaintiff must also plead facts demonstrating "that a <u>majority</u> of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director." <u>Id.</u>

1.   <u>Interest</u>

The <u>Rales</u> court explained that

[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. . . Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.

634 A.2d at 936 (citing <u>Aronson</u>, 437 A.2d at 812). Although plaintiff does not allege that any defendant engaged in self-dealing, or profited from being on both sides of one of the challenged transactions, plaintiff alleges that all of Cornell's directors have a disabling interest either because they have gained

---

[27]<u>Id.</u> at p. 5.

a personal financial benefit not available to other stockholders, or because they face a substantial likelihood of liability for breaching fiduciary duties owed to Cornell and to its shareholders.

(a)  Personal Financial Interest

Citing In re General Instrument Corp. Sec. Litig., 23 F.Supp.2d 867, 874 (N.D. Ill. 1998), plaintiff contends that David Cornell and Peter A. Leidel are interested because they received a personal benefit from insider trading.[28] Applying Delaware law the General Instrument court concluded that eight (out of thirteen) directors who sold their company stock at inflated prices for over $500 million while concealing adverse information about problems the company was having with two of its new products raised a reasonable doubt as to the director's disinterest because they received a personal financial benefit that was not available to other stockholders who neither sold their stock nor had access to the adverse information until it was publicly disclosed. Id. The court explained that the complaint not only alleged "that the [d]efendants engaged in a conspiracy [to conceal the adverse non-public information] for the purpose of profiting from the sale of their GIC stock at its inflated value, but [that the complaint was] also peppered with specific allegations that, if true, would support this assertion." Id.

---

[28]Id. at pp. 15-17 (citing Amended Complaint, p. 27 ¶ 55(a)).

-17-

Plaintiff in this case alleges that

[a]s a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at [b]oard meetings, each of the [d]irector [d]efendants knew the adverse non-public information regarding the improper accounting.  While in possession of this material adverse non-public information regarding the [c]ompany, the following [d]irector [d]efendants participated in the illegal insider selling:

> (i    David Cornell sold approximately 200,000 shares of Cornell stock at inflated prices for proceeds of over $2 million; and

> (ii   Leidel sold 2,000 shares of Cornell stock at inflated prices for proceeds of about $31,000.

Because these defendants personally benefitted from their wrongdoing, and there is a substantial likelihood of liability due to the improper insider selling, any demand upon them is futile.[29]

Although plaintiff argues that these allegations are sufficiently particularized to show futility of demand because they allege the number of shares sold, the price at which they were sold, and the total proceeds, the court is not persuaded that plaintiff has met his burden of pleading particularized facts that show these defendants are interested because they received a personal financial benefit from trading on inside information.

The case law makes clear "that the personal benefit must arise 'from the challenged transaction.'" Id. at 875 (quoting Rales, 634 A.2d at 933).  Although plaintiff asserts that David Cornell and Leidel are interested because they benefitted from the sale of

---

[29]Amended Complaint, p. 27 ¶ 55(a).

Cornell stock while in possession of adverse, non-public information, reaping approximately $2 million and $31,000 in proceeds, respectively, plaintiff's complaint does not allege any facts showing what, if any, adverse non-public information about the synthetic lease or the sale/leaseback transactions these defendants possessed, that their stock sales coincided with their possession of such information, or that their sales were calculated to maximize their personal benefit from the undisclosed information. Absent such allegations, plaintiff fails to raise an inference that these defendants are interested because they received a personal financial benefit that was not shared by other stockholders.

(b)  Liability for Breach of Fiduciary Duty

Delaware law imposes three primary fiduciary duties on the directors of corporations:  due care, loyalty, and good faith. Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001) (citing Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998)). Plaintiff alleges that all of Cornell's directors, including, especially, members of its Audit Committee, face a substantial likelihood of liability for breaching their fiduciary duty of due care for failing to supervise their subordinates.[30]   "Directors who are sued . . . have a

---

[30]Plaintiff also alleges that defendants David Cornell and Peter A. Leidel face a substantial likelihood of liability for breach of their fiduciary duty of loyalty for insider trading.

(continued...)

disabling interest when 'the potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood.'" <u>In re Baxter International, Inc. Shareholders Litig.</u>, 654 A.2d 1268, 1269 (Del. Ch. 1995) (quoting <u>Rales</u>, 634 A.2d at 936)). <u>See also</u> <u>Aronson</u>, 473 A.2d at 815 (mere threat of personal liability is insufficient to challenge the independence or disinterestedness of directors"). "Since a plaintiff must plead with particularity reasons why demand should be excused . . . the claim for relief against the directors must also be pled with particularity." <u>Id.</u> at 1270.

Plaintiff contends that all of Cornell's directors breached their fiduciary duties of good faith and loyalty by failing to exercise reasonable and prudent supervision over the management and affairs of Cornell.[31]  Citing <u>In re Oxford Health Plans, Inc., Sec. Litig.</u>, 192 F.R.D. 111, 115-117 (S.D.N.Y. 2000), and <u>Caremark International Inc. Deriv. Litig.</u>, 698 A.2d 959, 970-971 (Del. Ch. 1996), plaintiff argues that

> [t]he [b]oard's nonfeasance is clearly demonstrated by
> the fact that the controls in place were so inadequate

---

[30](...continued)
However, since the court has already concluded that plaintiff's allegations of insider trading against these defendants fail to raise an inference that they are interested directors because they received a personal financial benefit as a result of the challenged transactions, the court concludes that plaintiff has failed to raise an inference that these defendants face a substantial likelihood of liability for insider trading.

[31]Plaintiff's Opposition, pp. 17-21.

> that the nine [b]oard members and the various
> [c]ommittees on which they served, could not keep track
> of the [c]ompany's financial accounting.  By not ensuring
> that the proper controls were in place, the entire
> [b]oard has breached its duty of care, and therefore
> demand is excused.[32]

Plaintiff also contends that defendants Cooper, Taylor, Leidel,

Chase, and Watts face a substantial likelihood of liability for

breaching their fiduciary duties because as members of Cornell's

Audit Committee they were

> responsible for monitoring the quality and integrity of
> the [c]ompany's financial reporting process and systems
> of internal controls regarding finance, accounting and
> legal compliance, as well as monitoring compliance with
> legal and regulatory requirements . . . [but that] in
> derogation of these specific duties, the Audit Committee
> recommended to the [b]oard that the [c]ompany's improper
> financial statements be included in the [c]ompany's
> [a]nnual [r]eport and filed with the SEC on Form 10-K for
> the fiscal year ended December 31, 2000 and December 31,
> 2001. . . By such actions, these <u>five</u> defendants breached
> their duties by causing or allowing the improper
> financials described throughout the [c]omplaint.  These
> filings were admittedly erroneous, as the [c]ompany had
> to ultimately restate seven quarters of financial
> statements, specifically all of fiscal year 2000 and the
> first three years of 2001. . . Further, these five
> [d]efendants, also signed the false and misleading
> [r]egistration [s]tatement.[33]

These conclusory allegations are insufficient to raise an inference

that a majority of Cornell's directors face a substantial

likelihood of liability for breach of fiduciary duty.

---

[32]<u>Id.</u> at p. 20.

[33]<u>Id.</u> at p. 10 (citing Amended Complaint, ¶¶ 2, 11, 12, 14, 16, 17, 27, 29, 31, 33, 35, 45, 55(c)).

Caremark involved alleged violations of federal and sate laws and regulations applicable to health care providers.  698 A.2d at 960.  The alleged violations caused Caremark to endure a four-year investigation by the United States Department of Health and Human Services and the Department of Justice following which it was indicted for multiple felonies.  Id.  Pursuant to a plea agreement Caremark agreed to pay fines and to reimburse various parties in payments that totaled approximately $250 million.  Id. at 960-961. The shareholder derivative suit brought against Caremark directors seeking to hold them personally liable for these losses alleged that the directors breached their duty of care by failing either to supervise the conduct of Caremark employees or to institute corrective measures once they learned that the employees engaged in wrongful conduct.  Id. at 964.  Concluding that the director defendants were "to some extent unaware of the activities that led to liability," id. at 971, the court concluded that claims for breach of fiduciary duty asserted against them were "extremely weak."  Id. at 972.  The court explained that

> where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists — will establish the lack of good faith that is a necessary condition to liability.  Such a test of liability — lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight — is quite high.

Id. at 971.

The allegations of directorial liability in this case are even weaker than those alleged in Caremark.  Plaintiff fails to allege any facts regarding the synthetic lease.[34]  Plaintiff does not allege when it was executed, why it was executed, or who executed it.  Nor does he allege that any of the director defendants had any reason to suspect that it was in any way improper.  Plaintiff alleges that the sale/leaseback transaction violated GAAP because in September of 2001, a month after it was announced, Cornell paid Lehman Brother's a $3.5 million retainer.  Although plaintiff alleges that the $3.5 million retainer violated GAAP because it reduced the lessor/SPE's equity investment to less than three percent, plaintiff does not allege that any member of the Audit Committee or any other director defendant approved or even knew about the retainer payment when it was made.  Nor does plaintiff

---

[34]Synthetic leases are treated as operating leases for accounting purposes but are treated as a secured loan for other purposes, including tax purposes.  While there is some controversy over this treatment, there is no question that "general law treats synthetic lease arrangements as transparent for tax and other purposes." Unocal Corp. v. Kaabipour, 177 F.3d 755, 765-766 & n.8 (9th Cir.), cert. denied sub nom. Hindi v. Tosco Corp. and Simmons v. Unocal Corp., 120 S.Ct. 614 (1999).  See also Barron v. Smith, 380 F.3d 49, 55-56 & n.5 (1st Cir. 2004) (recognizing that synthetic leases are financing method); Black's Law Dictionary 899 (7th Ed. 1999) (defining "synthetic lease" as "[a] method for financing the purchase of real estate, whereby the lender creates a special-purpose entity that buys the property and then leases it to the ultimate user (usu. a corporation). ● A synthetic lease is treated as a loan for tax purposes and as an operating lease for accounting purposes, so that the 'lessee' can deduct the property's depreciation and the loan's interest yet keep both the asset and the debt off its balance sheet.").

allege that any of the defendants failed to take corrective action
once they were alerted to the retainer payment and the possibility
that it might have made the company's accounting for the
sale/leaseback transaction improper.  Instead, plaintiff alleges
that Cornell's outside auditor questioned the retainer's propriety,
and that in response to the auditor's questions, the board formed
a special committee to investigate the transaction.  Plaintiff also
alleges that upon investigation the special committee decided to
investigate the synthetic lease and ultimately decided to restate
Cornell's finances for seven quarters.

     The court cannot conclude from these allegations that the
director defendants face a substantial likelihood of liability for
having breached their fiduciary duty of due care by failing to
supervise and/or monitor Cornell's execution or reporting of the
synthetic lease or the sale/leaseback transaction because plaintiff
fails to allege facts showing "that the director defendants were
guilty of a sustained failure to exercise their oversight function"
or that they "either lacked good faith in the exercise of their
monitoring responsibilities or conscientiously permitted a known
violation of the law by the corporation to occur."  Caremark, 698
A.2d at 971, 972.  Oxford Health Plans, 192 F.R.D. at 111, on which
plaintiff relies, is factually distinguishable.

     In Oxford the court held that plaintiffs properly alleged
demand futility because they alleged facts showing that the

defendants knew that management had misrepresented the company's
financial crisis to the financial markets but failed to take
corrective action because they feared that doing so would harm the
company's market price, increase regulatory oversight, slow company
growth, and jeopardize both their personal and financial interests
and their personal ties to the company's CEO.  Id. at 115.  Since
plaintiff fails to allege any facts showing that any director
defendant knew anything about the synthetic lease entered in 2000,
the sale/leaseback agreement entered in August of 2001, or the
retainer paid to Lehman Brothers in September of 2001 before it was
questioned by Cornell's independent auditor, and does not allege
that once the retainer was questioned the defendants failed to take
corrective action, the court concludes that plaintiff has failed to
allege any fact, much less particularized facts, suggesting that
any of Cornell's directors face a substantial likelihood of
liability for breaching their fiduciary duty of due care.

    2.  Independence

    The Rales court explained that

    [i]ndependence means that a director's decision is based
    on the corporate merits of the subject before the board
    rather than extraneous considerations or influences. . .
    To establish lack of independence, [plaintiff] must show
    that the directors are 'beholden' to . . . [an interested
    party] or so under . . . [an interested party's]
    influence that their discretion would be sterilized.

634 A.2d at 936 (quoting Aronson, 437 A.2d at 816).  Plaintiff
alleges that three directors lack independence because they are

employed by Cornell, and that two directors lack independence because they have debilitating business relations with other Cornell directors.

    (a)  Employee Directors

Plaintiff alleges that Phillips as Executive Chairman, Logan as President and Chief Executive Officer, and Lissner as Managing Director of National Marketing and Development were inside directors whose principal professional occupation was their employment with Cornell.[35]  Plaintiff also alleges that Logan received a very lucrative compensation package that correlated with the improper accounting treatment of the sale/leaseback transaction, and that in order to protect his compensation and executive position he would not bring suit against the board, especially against defendants Taylor and Phillips who plaintiff asserts were members of Cornell's Compensation Committee.[36]  Citing In re The Student Loan Corp. Derivative Litig., 2002 WL 75479, *3 (Del. Ch. 2002), plaintiff contends that the employee-directors were incapable of impartially considering a demand to prosecute this action because they were subject to considerable influence from other board members to maintain their employment at Cornell.

In order to plead lack of independence, plaintiff must allege particularized facts raising a reasonable doubt that the employee

---

[35]Amended Complaint, p. 28 ¶ 55(b).

[36]Id. at p. 29 ¶ 55(e), and p. 30 ¶ 55(i).

directors are capable of making decisions for the corporation based on the merits of the subject rather than on extraneous considerations or influences.  See <u>Aronson</u>, 473 A.2d at 816. Plaintiff's claim that the employee directors are not independent from board members, who have the ability to control their employment and compensation, is based solely on their employment positions with Cornell and the compensation that they received for performing the duties of those positions.  Demand futility cannot be pleaded merely on the basis of allegations that inside directors would act to preserve their employment positions.  <u>In re Sagent Technology Deriv. Litig.</u>, 278 F.Supp.2d 1079, 1089 (N.D. Calif. 2003) (citing <u>Grobow</u>, 539 A.2d at 188)).  If this were the case, every inside director would be disabled from considering a pre-suit demand.  <u>Id.</u>

Demand futility based on lack of independence must allege that a director is beholden to another director who is interested in the challenged transactions.  <u>See Rales</u>, 634 A.2d at 936.  Since plaintiff's complaint fails to allege particularized facts showing that any of the three employee directors is beholden to another director who is interested in the challenged transactions, and fails to allege any facts showing why a decision to prosecute plaintiff's claims would jeopardize any of their positions as Cornell employees, the complaint fails to raise a reasonable doubt as to the independence of Phillips, Logan, or Lissner.  <u>Id.  See</u>

-27-

also <u>Kahn v. Roberts</u>, 1994 WL 70118, *5 (Del. Ch. 1994) (character-izing similar argument as "a different formulation of the often-rejected argument that pre-suit demand is excused because 'directors otherwise would have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution'").  The cases on which plaintiff relies do not hold to the contrary.  <u>See</u> <u>Student Loan</u>, 2002 WL 75479, at *3 (employee directors beholden to an interested majority stock-holder); <u>In re Cooper Cos., Inc. Shareholders Derivative Litig.</u>, 2000 WL 1664167, *6-*7 (Del. Ch. 2000) (employee director beholden to an interested director); <u>Mizel v. Connelly</u>, 1999 WL 550369, *3 (Del. Ch. 1999) (same); <u>In re eBay, Inc. Shareholders Derivative Litig.</u>, 2004 WL 253521, *2-*3 (Del. Ch. 2004) (non-employee director who received substantial stock options was beholden to interested employee directors).

    (b)   Related Directors

Plaintiff alleges that David Cornell and Marcus A. Watts lack independence based upon employment and business relations with other directors.[37]  Plaintiff alleges that David Cornell is beholden to the board because it caused the company to enter into a consulting agreement with him whereby he receives an annual salary of at least $255,000 for each of the first four years of a seven-year contract, an annual salary of at least $180,000 for each

---

[37]Plaintiff's Opposition, pp. 14-15.

of the last three years of a seven-year contract, and an annual salary of at least $300,000 for each renewal period should the consulting contract be renewed.[38] Plaintiff alleges that Watts is beholden to the board because it caused Cornell to pay substantial legal fees to his law firm in 2001, and that he benefits personally from these legal fees through partnership distributions.[39] Plaintiff also alleges that Watts and Phillips are both directors of another entity, Aeriform Corporation, and that their long-standing and entangled business relationship would prevent their taking action against Cornell.[40]

Citing <u>In re New Valley Corp. Derivative Litig.</u>, 2001 WL 50212, *8 (Del. Ch. 2001), plaintiff contends that at the pleading stage of the case allegations that disabling relationships exist is enough to raise a reasonable doubt regarding David Cornell's and Watts' ability to consider a demand based solely on its merits rather than on extraneous considerations or influences. Citing <u>Orman</u>, 794 A.2d at 27 & n.55, defendants argue that "mere recitation of the fact of past business or personal relationships will not make the [c]ourt automatically question the independence of a challenged director."[41]

---

[38]<u>Id.</u> at pp. 14-15 (citing Amended Complaint, p. 29 ¶ 55(f)).

[39]<u>Id.</u> at p. 15 (citing Amended Complaint, p. 30 ¶ 55(h)).

[40]<u>Id.</u> (citing Amended Complaint, p. 31 ¶ 55(m).

[41]Defendants' Reply Brief in Support of Motion to Dismiss, Docket Entry No. 37, pp. 12-13.

Plaintiff's allegations fail to raise a reasonable doubt regarding the independence of David Cornell or Watts because, as with the employee directors, plaintiff fails to allege that either of these two defendants is beholden to anyone who is interested in the transactions challenged in this lawsuit.  "When lack of independence is charged, a plaintiff must show that the board is either dominated by an officer or director who is a proponent of the challenged transaction or that the board is so under his influence that its discretion is sterilized." <u>Levine v. Smith</u>, 591 A.2d 195, 205 (Del. 1991), <u>overruled on other grounds by Brehm</u>, 476 A.2d at 244.  Plaintiff's failure to allege any facts, much less particularized facts, showing either that David Cornell or Marcus A. Watts was dominated by a director who was interested in the challenged transactions, or that they were so under the influence of such an individual that they would not have been able to exercise their own independent judgment when weighing a demand from plaintiff to prosecute the claims asserted in this lawsuit, leads the court to conclude that plaintiff's failure to make a demand upon Cornell's directors should not be excused based on the business relations alleged in plaintiff's complaint.[42]

---

[42]<u>New Valley</u>, 2001 WL 50212, a case on which plaintiff relies, does not hold the contrary.  The court in that case found demand futility based on business and personal relationships because the facts alleged showed "that all the members of the current [b]oard have current or past business, personal, and employment

(continued...)

### III.  **Plaintiff's Request for Leave to Amend**

At the end of plaintiff's response to the defendants' motion
to dismiss plaintiff requests leave to amend his complaint:

> Plaintiff is confident that the [c]omplaint is more than
> sufficient under the applicable pleading standards to
> defeat [d]efendants' [m]otion.  However, should the
> [c]ourt grant [d]efendants'] [m]otion, plaintiff
> respectfully moves and requests that this [c]ourt permit
> amendment of the pleadings consistent with the Federal
> Rules of Civil Procedure.  Rule 15(a) provides that leave
> to amend a pleading 'shall be freely given when justice
> so requires.'[43]

The Fifth Circuit recognizes that leave to amend shall be
freely granted when justice so requires, Goldstein v. MCI WorldCom,
340 F.3d 238, 254 (5th Cir. 2003), and that Federal Rule of Civil
Procedure 15 evinces a bias in favor of granting leave to amend.
Id. (citing Southern Constructors Group, Inc. v. Dynalectric Co.,
2 F.3d 606, 611 (5th Cir. 1993)).  However, the Fifth Circuit has
also stated that leave to amend under Rule 15 is by no means
automatic, Southern Constructors, 2 F.3d at 612, and has upheld the
denial of leave to amend when the moving party engaged in undue
delay, Little v. Liquid Air Corp., 952 F.2d 841, 846 (5th Cir.
1992), or attempted to present theories of recovery serially to the
district court.  Southern Constructors, 2 F.3d at 612.  The Supreme

---

[42](...continued)
relationships with each other and the entities involved" in the
challenged transaction.  Id. at *7.

[43]Plaintiff's Opposition, p. 23.

Court has sanctioned bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment as plausible reasons for a district court to deny a party's request for leave to amend. See Foman v. Davis, 83 S.Ct. 227, 230 (1962). See also Wright v. Allstate Ins. Co., 415 F.3d 384, 391 (5th Cir. 2005) ("Among the permissible bases for denial of a motion to amend are 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.").

The record before the court demonstrates that plaintiff has filed two complaints in this action:  an Original Complaint filed on May 15, 2002 (Docket Entry No. 1), and a Verified Amended Derivative Complaint filed on August 28, 2002 (Docket Entry No. 12). The last complaint is 37 pages long. In addition to being poorly drafted and repetitive, plaintiff's amended complaint is legally deficient. Yet, almost as an afterthought, plaintiff has tacked a general curative amendment request to the end of his response in opposition to the defendants' motion to dismiss. Plaintiff was certainly aware of the defendants' objections to his complaint as written because a virtually identical version of the

motion was filed almost three years ago on September 12, 2002 (Docket Entry No. 14). Despite this awareness plaintiff has not demonstrated how he would replead his claims with greater specificity if given the opportunity, has not proffered a proposed second amended complaint, and has not suggested in his responsive pleadings any additional facts not initially pleaded that could, if necessary, cure the pleading defects raised by the defendants. See Goldstein, 340 F.3d at 254-255. Under these circumstances the court is not persuaded that plaintiff should receive another opportunity to amend his complaint. See McKinney v. Irving Independent School Dist., 309 F.3d 308, 315 (5th Cir. 2002), cert. denied, 123 S.Ct. 1332 (2003) (finding no abuse of discretion in the district court's denial of leave to amend where the plaintiffs failed to submit a proposed amended complaint in a request for leave to amend and failed to alert the court to the substance of any proposed amendment). Accordingly, plaintiff's request for leave to amend will be denied.

## IV.  Conclusions and Order

For the reasons explained above, the court concludes that plaintiff has failed to allege facts that create a reasonable doubt whether, when the complaint was filed, Cornell's board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. Accordingly,

-33-

Defendants' Motion to Dismiss (Docket Entry No. 31) is **GRANTED,** plaintiff's request to file a second amended complaint is **DENIED,** and this action will be dismissed.

**SIGNED** at Houston, Texas, on this 31st day of August, 2005.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE